958 So.2d 1093 (2007)
Dominick CASAMASSINA, as Trustee and on behalf of the Marital Trust, and Lillian Casamassina, individually and as Personal Representative of the Estate of John Casamassina, deceased, Appellants,
v.
The UNITED STATES LIFE INSURANCE COMPANY IN the CITY OF NEW YORK and Judith Sams, Appellees.
No. 4D05-4008.
District Court of Appeal of Florida, Fourth District.
June 20, 2007.
*1095 Lawrence I. Bass of Law Office of Lawrence I. Bass, North Palm Beach, John P. Wiederhold of Wiederhold & Moses, P.A., West Palm Beach, and John L. Maloney of John L. Maloney, P.A., St. Petersburg, for appellants.
Wendy S. Leavitt and Barbara Bolton Litten of Squire, Sanders & Dempsey, L.L.P., West Palm Beach, for appellee, The United States Life Insurance Company in the City of New York.
Michael R. Holt of Rumberger, Kirk & Caldwell, Miami, for appellee, Judith Sams.
GROSS, J.
United States Life Insurance Company issued a $500,000 life insurance policy to John Casamassina on November 6, 1997. Less than two weeks later, Casamassina was diagnosed with a brain tumor; he died on December 4, 1997. After U.S. Life denied the policy claim, the trust beneficiary of the policy and the widow filed suit. The circuit court granted summary judgment in favor of the defendants, concluding that the undisputed facts demonstrated that John "knowingly and intentionally made multiple, material misrepresentations regarding his medical history and condition and that, absent these multiple, material misrepresentations, U.S. Life would not have issued the Policy or would have issued the Policy on different terms."
Finding that issues of fact remain as to the claim against U.S. Life, we reverse. We affirm the judgment in favor of another defendant, Judith Sams, who was sued for negligence, holding that she owed no legal duty to either John or appellants.
We state the facts in the light most favorable to appellants,[1] Dominick Casamassina, as Trustee of the John D. Casamassina Marital Trust and Lillian Casamassina, John's widow and the personal representative of his estate.
Until December, 1996, John was an officer of a communications company. After John became self-employed, in May or June, 1997, Lillian requested that U.S. Life send her information about a life insurance policy to replace the former employer's group life coverage that John had lost. Unrelated to this search for life insurance, in July, 1997, Lillian scheduled an *1096 appointment for John with her personal physician, Dr. Mark Rattinger. At his prior job, John underwent annual physical examinations. Lillian believed that John should continue with physicals after becoming self-employed. John did not have a personal physician, because, according to Lillian, "he was never sick with anything."

8/5/97 Visit to Dr. Poet
In August, 1997, John experienced headaches and sinus congestion. While vacationing in New Jersey, Lillian scheduled an August 5 appointment for John with Dr. Albert Poet, an ear, nose and throat specialist. Lillian noticed that John was "all congested" and "sneezing every minute." She thought that the doctor might give her husband a prescription that would relieve his symptoms for the drive home to Florida.
On Dr. Poet's medical history form, John checked off that he had nasal discharge, sinus problems, and a frequent sore throat. He also indicated that he had experienced dizziness and blurred or double vision. On a separate dizziness questionnaire, John disclosed that he first began to experience daily "attacks or episodes" of dizziness three weeks before; the attacks occurred in the morning and lasted one to two hours. During the dizziness episodes, John indicated that he experienced the following sensations when dizzy: lightheadedness, swimming sensation in the head, tendency to fall to the right and the left, balance problems when walking, headache, nausea or vomiting, and pressure in the head.
Dr. Poet suspected that John was suffering from benign positional vertigo, discussed this diagnosis with him and gave him a "Vertigo booklet." The doctor also gave John a nose spray and said "You'll be okay."

8/11/97 Appointment with Dr. Rattinger
After his return to Florida, John saw Dr. Rattinger for the physical that Lillian had previously scheduled. The doctor had never before treated John. He told the doctor that he felt congested, that he had moderate to severe headaches, and that he wondered whether his symptoms had to do with his eyes. In his record of this visit, Dr. Rattinger reported:
[John Casamassina] [i]s a very pleasant 43 year old white gentleman who for the past three to four weeks has been having moderate to severe posterior occipital headaches. Initially waking him up from sleep though they are not at the present time. He has also noticed there has been some decrease in visual acuity in his right eye for about six weeks. He initially had nausea and vomiting though this, too has improved. There is no history of head trauma or prior history of serious headaches in him or his family.
Dr. Rattinger formed an impression that the headaches were "probably stress tension" and prescribed Flexeril, a muscle relaxer. However, he also "[n]eed[ed] to rule our other etiologies," so he recommended that John undergo a "head MRI with special attention to the posterior occipital region." The doctor also ordered blood work and a chest x-ray and sent John to an eye doctor to try and eliminate another potential cause of headaches. Dr. Rattinger then wrote:
I will see John back in several weeks. In the meantime, I am trying to do my best to get him to do hot massages at night, relaxation therapy and will have him take Flexeril tablet at bedtime.

8/13/97 Appointment with Eye Doctor Costello
John's appointment with the eye doctor, S.L. Costello produced no information related *1097 to the headaches. The doctor diagnosed John with mild astigmatism in the right eye.

St. Mary's MRI
John was not enthused about going for the MRI recommended by Dr. Rattinger. He told Lillian that the test was "just doctors looking to make money. There is nothing wrong with me."
Shortly after the office visit with Dr. Rattinger, John went to St. Mary's Hospital for an MRI. However, he refused to complete the test, stating that he was claustrophobic. Back at home, Lillian called Dr. Rattinger's office to ask if the MRI should be rescheduled since John was no longer experiencing headaches. The office told Lillian that it would not be necessary to reschedule the MRI; as Dr. Rattinger later remembered
[s]ince Mr. Casamassina's symptoms had completely resolved, and since he gave a history of severe claustrophobia when he attempted to get an MRI, I did not press him to proceed with this, but merely told him to contact me should his symptoms recur.

9/19/1997 Visit to Dr. Rattinger
On September 19, 1997, John returned to Dr. Rattinger for a follow-up appointment. He told the doctor that he was feeling fine. The doctor noted in his records that John's "headaches had resolved. He is feeling well. He was unable to do the MRI because of claustrophobia. He has no complaints today." Lillian asked whether the MRI should be rescheduled; the doctor said that it was not necessary unless John's headaches returned.

9/19/1997 Meeting With Judith Sams for Life Insurance Medical Examination
On the same day as the Rattinger appointment, the Casamassinas met at their home with Judith Sams for the basic medical examination and to complete part B of his life insurance application with U.S. Life. Sams was a licensed medical assistant working for Portamedic, a company that provides medical examination services to U.S. Life and other companies in connection with life insurance applications. After receiving an examination request, Portamedic typically would contact one of its examiners, who would arrange with the insurance applicant for an appointment.
Sams had completed many health history reports for U.S. Life. Although she did not remember anything about her meeting with John, Sams testified at her deposition that it was her practice to read the health questions on an application form verbatim and to record an applicant's full and complete response to each question; if discrepancies existed between answers on the form, she would not have attempted to reconcile them.
In response to question 1(c) of the application, John responded that he saw Dr. Rattinger for headaches in August, 1997 and was prescribed Flexeril.
Question 7 on the form asked whether John had ever been treated for or had any known indication of various physical conditions. "Headache" was one of the conditions listed in question 7.a. John asked for clarification on how to answer that question, since he had already indicated in response to question 1 that he had consulted with Dr. Rattinger for headaches, and that he did not have convulsions, epilepsy or paralysis. Sams replied that in answering application questions, John "did not have to repeat conditions previously mentioned or disclosed." She explained that what U.S. Life was looking for was whether John had had a long history of headaches; since the headaches he experienced had only recently begun, he did not need to respond affirmatively to question 7.a.
*1098 After Sams's explanation, John's response to question 7 indicated that he had never "been treated for" or "had any known indication of":
a. convulsions, epilepsy, paralysis, neuritis, sciatica, nervous breakdown, headache, dizziness, fainting spells, speech defect, nervous or mental disorder[.]
* * *
d. recurrent indigestion, ulcer, colitis, diverticulitis, hernia, internal bleeding, appendicitis, disorder of stomach, liver, digestive or abdominal organs[.]
* * *
g. impairment of vision or hearing or disorder of eyes, ears, nose or throat[.]
* * *
John's answer to question 7.a. failed to take into account the dizziness that John described for Dr. Poet on August 5. Also, in response to question 10, John responded that within the past 5 years, he had not (a) had not had any mental or physical disorder not listed above, (b) had a checkup, consultation, illness, injury, or surgery, and (c) been advised to have any diagnostic test other than an HIV test, hospitalization, or surgery which was not completed.
John signed the application with this declaration:
I hereby declare that, to the best of my knowledge and belief, the information given above is correctly recorded, complete, and true, and I agree that the Company [US Life], believing it to be true, shall rely and act upon it accordingly.
(Emphasis added).

11/6/97 Issuance of Policy
On November 6, 1997, U.S. Life issued John a $500,000 life insurance policy.

11/7/97 Follow Up Visit to Dr. Rattinger
One day after the policy issued, John met with Dr. Rattinger for a follow-up visit. He complained that for "the last month," when he woke up in the morning and sat up, he got dizzy and nauseated; the feeling went away gradually and he then felt fine for the rest of the day. Dr. Rattinger was concerned that if the symptoms continued, he might recommend a head MRI to rule out posterior circulation abnormalities. The doctor sent John for an upper GI series and a gall bladder scan, which came back negative.

11/19/97 MRI
A November 19 MRI revealed that John had a large brain tumor. Dr. Rattinger told the Casamassinas that the tumor was the cause of John's symptoms. This was the first time that the Casamassinas learned of the seriousness of John's medical condition.

12/4/97
John died following an unsuccessful operation to remove the tumor.

Policy Claim and U.S. Life's Declination
The trustee of John's marital trust, the beneficiary of the policy, submitted a claim for policy benefits. After investigating the claim, U.S. Life rescinded the policy on the ground that John had made material misrepresentations in his application. The company's letter to the trustee's attorney explained that had John disclosed that he had been experiencing headaches, nausea, vomiting, a decrease in visual acuity and that he had been ordered to undergo an MRI, U.S. Life would have "required the results of the MRI before a decision was made and once the results were received," ultimately would not have issued the policy.

The Lawsuit
By an amended complaint, appellants sued U.S. Life and Judith Sams. Count I *1099 is a breach of contract claim against U.S. Life. Count II is a negligence claim against Judith Sams and U.S. Life, contending that U.S. Life is vicariously liable for the actions of Sams.
The nut of the negligence claim against Sams concerned her failure to correctly record John's responses at the September 19, 1997 interview. The count alleged Sams's legal duty to John to "correctly record the responses" John gave to the application questions and claimed that Sams "negligently failed to record the answers" John gave. The pleading specified the negligence as Sams's report that John's response to question 7a was that he had not been treated for headache, when John actually told Sams that "he had recently seen Dr. Rattinger for a physical and that during the physical he revealed . . . recent episodes of headaches for which Dr. Rattinger prescribed Flexeril." The count alleged that U.S. Life refused to honor the policy as a result of these incorrect answers.

The Circuit Court Properly Considered John's Medical Records in Ruling on the Summary Judgment
Appellants' first attack the trial court's reliance on John's medical records in granting summary judgment. They argue that "the alleged records of Dr. Poet, Dr. Costello and Dr. Rattinger, as well as the alleged records of Harbourview Imaging, Dr. Grabel, Good Samaritan Medical Center and Palm Beach Pathology should not have been considered."
We reject this argument. Appellants filed their case in October, 1999. John's medical condition and what he knew about it have always been the central fact issues in the case. There is no indication that the records at issue are not what they purport to be. See Mims v. Old Line Life Ins. Co. of Am., 46 F.Supp.2d 1251, 1260 (M.D.Fla.1999). "[A]uthentication or identification of evidence is required as a condition precedent to its admissibility." § 90.901, Fla. Stat. (2006). "Evidence is authenticated when prima facie evidence is introduced to prove that the proffered evidence is authentic." ITT Real Estate Equities, Inc. v. Chandler Ins. Agency, Inc., 617 So.2d 750 (Fla. 4th DCA 1993). Authentication by circumstantial evidence is permissible; "evidence may be authenticated by appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." Id. at 751. A court may consider circumstances of discovery in determining prima facie authenticity. See U.S. v. Elkins, 885 F.2d 775 (11th Cir. 1989); U.S. v. Dumeisi, 424 F.3d 566 (7th Cir.2005). The trial court has great latitude in determining whether the proponent of evidence has met the burden of establishing a prima facie case of authenticity. E.g., State v. Love, 691 So.2d 620 (Fla. 5th DCA 1997). Appellants released some of the records in their original claim to U.S. Life. Dr. Poet's records were produced in response to a court-ordered authorization form. Declarations of authenticity filed by U.S. Life complied with the requirements of section 90.803(6)(a), Florida Statutes (2006), which provides that the foundation for the admission of business records may be shown "by a certification or declaration that complies with paragraph (c) and s. 90.902(11), unless the sources of information or other circumstances show lack of trustworthiness." Florida Rule of Civil Procedure 1.510(e) allows "affidavits to be supplemented." This was not a case where the party opposing summary judgment had never seen the exhibits relied upon to grant summary judgment.

The Circuit Court Erred in Entering Summary Judgment for U.S. Life
Pursuant to Rule 1.510(c) of the Florida Rules of Civil Procedure, an entry *1100 of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, admissions, affidavits, and other materials as would be admissible in evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A material fact, for the purpose of a summary judgment motion, "`is a fact that is essential to the resolution of the legal questions raised in the case.'" Goldman v. State Farm Fire Gen. Ins. Co., 660 So.2d 300, 302 n. 4 (Fla. 4th DCA 1995) (quoting Holland v. Verheul, 583 So.2d 788, 789 (Fla. 2d DCA 1991)). Because the propriety of the entry of summary judgment is a question of law, the applicable standard of review is de novo. See Major League Baseball v. Morsani, 790 So.2d 1071 (Fla.2001); Volusia County v. Aberdeen at Ormond Beach, 760 So.2d 126, 130 (Fla.2000). Where credibility issues impact the determination of material facts, summary judgment is not appropriate. See Kuczkir v. Martell, 480 So.2d 700 (Fla. 4th DCA 1985).
Under section 627.409, Florida Statutes (1997), an insurer may rescind an insurance policy on the grounds of misrepresentation if it can prove:
(a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.
(b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.
U.S. Life cites federal cases favorable to its position. However,
[t]o the extent that the federal cases permit summary judgment based on Federal Rule of Civil Procedure 56 as interpreted in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), they are of limited precedential value in Florida summary judgment cases. Florida places a higher burden on a party moving for summary judgment in state court, requiring the movant to: "[S]how conclusively that no material issues remain for trial."
Byrd v. BT Foods, Inc., 948 So.2d 921, 923-24 (Fla. 4th DCA 2007) (quoting Visingardi v. Tirone, 193 So.2d 601, 604 (Fla.1966)).
Under the statute, the general rule is that "a misstatement in, or omission from, an application for insurance need not be intentional before recovery may be denied pursuant to 627.409." Kieser v. Old Line Life Ins. Co. of Am., 712 So.2d 1261, 1263 (Fla. 1st DCA 1998). If this rule applied, we would affirm. However, the general rule is inapplicable here because John's signed application contained the declaration that the information given was "correctly recorded, complete, and true" "to the best of my knowledge and belief."
Because of this wording in the application, under Green v. Life & Health of America, 704 So.2d 1386 (Fla.1998), the "less stringent `knowledge and belief' standard set forth in the insurance application controls over the strict standard set forth in section 627.409(1)." GRG Transport, Inc. v. Certain Underwriters at Lloyd's London, 896 So.2d 922, 925 (Fla. 3d DCA 2005). Application of this standard means that an omission or misrepresentation in an insurance application, when the application is completed to the best of the applicant's knowledge and belief, is not a basis for rescission of a policy. Like fraud cases, summary judgment is rarely proper *1101 in "knowledge and belief" cases because the issue usually "turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." Cohen v. Kravit Estate Buyers, Inc., 843 So.2d 989, 991 (Fla. 4th DCA 2003). "[C]onflicting inferences from the record about intent or understanding are best left for the jury and [are] not appropriate for summary judgment." Bruno v. Destiny Transp., Inc., 921 So.2d 836, 844 (Fla. 2d DCA 2006).
There is authority stating that the "knowledge and belief" test under Green requires a showing that an insured intentionally made the representations that an insurance company claims as grounds for rescission. See Kieser, 712 So.2d at 1263; Mims, 46 F.Supp.2d at 1254. This test misses the marka person's misrepresentations or omissions from an insurance application may fail to meet the knowledge and belief standard, without being intentional.
Green cited with approval William Penn Life Insurance Co. of New York v. Sands, 912 F.2d 1359 (11th Cir.1990); we agree with the test set forth in Sands for evaluating whether an insured's responses to questions in an insurance application were given according to the best of his knowledge and belief:
[T]he twin qualifiers [knowledge and belief] require[ ] that knowledge not defy belief . . . What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deceptionpersons who having witnessed the Apollo landings, still believe the moon is made of cheese.
Sands, 912 F.2d at 1365 (quoting Skinner v. Aetna Life & Cas., 804 F.2d 148, 151 (D.C.Cir.1986)).
The circumstances surrounding John's insurance application certainly raise questions about what he knew and when he knew it. One view of the record is that appellants have filled in gaps to manufacture a case to avoid summary judgment. Still, we are precluded from passing on the credibility of Lillian's version of the facts and find that application of the "knowledge and belief" standard in this case is a jury question. In the light most favorable to appellants, John's answers to question 7.a. were impacted by Sams's explanation that the question did not call for conditions disclosed in answer to another question or for which there had not been a long history. The failure to disclose the St. Mary's MRI episode could fall within the "knowledge and belief" standard due to Dr. Rattinger's withdrawal of the MRI order in light of John's complete absence of physical complaints on September 19. In the light most favorable to John, on the day of the insurance application all his symptoms had resolved, he had no complaints, and he was a picture of perfect health. A jury could find that the failure to disclose the Dr. Poet visit in response to question 10.b., taken alone, would not be fatal to the claim, since adequate disclosurethat John received nose drops after consulting Poet for congestion and sneezingwould not have put a careful insurer on notice that further inquiry was warranted to adequately gauge the risk of issuing a policy.

The Circuit Court Properly Entered Summary Judgment in Favor of Sams
We affirm the circuit court's grant of summary judgment as to Sams, concluding *1102 that Sams owed no legal duty to John or appellants. One "way of framing the issue of duty is to ask whether a defendant stood in a `relation to the plaintiff as to create any legally recognized obligation of conduct for the plaintiff's benefit.'" Palm Beach-Broward Med. Imaging Ctr., Inc. v. Cont'l Grain Co., 715 So.2d 343, 344 (Fla. 4th DCA 1998) (quoting W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 42, at 274 (5th ed.1984)).
Sams acted as an agent of the insurance company to fill in the insurance application. Her "act in doing so [was] the act of the company." Stix v. Cont'l Assur. Co., 147 Fla. 783, 787, 3 So.2d 703, 704 (1941). If Sams negligently misled John in the application process, the insurance company is "estopped" from relying on resulting errors in the application to deny or revoke coverage. Columbian Nat. Life Ins. Co. v. Lanigan, 154 Fla. 760, 767, 19 So.2d 67, 70 (1944); see Mass. Bounding & Ins. Co. v. Williams, 123 Fla. 560, 566-68, 167 So. 12, 14-15 (1936). As an agent for the insurance company in what amounts to a contract negotiation, Sams did not owe any negligence-based duty to persons negotiating on the other side. See City of Miami Beach v. Dickerman Overseas Contracting Co., 659 So.2d 1106 (Fla. 3d DCA 1995); Assad v. Mendell, 511 So.2d 682 (Fla. 3d DCA 1987); Adams v. Chenowith, 349 So.2d 230 (Fla. 4th DCA 1977).
We find the undertaker's doctrine of Clay Electric Cooperative v. Johnson, 873 So.2d 1182, 1186 (Fla.2003) to be inapplicable; this is not a case involving "physical harm" within the meaning of Section 323 of the Restatement (Second) of Torts (1965). Also, we distinguish this case from the "contract-based negligence claims" referred to in Clay, id. at 1186, n. 6, because Sams was neither engaged to perform a service reasonably expected to be relied upon by a stranger to the engagement, see First Am. Title Ins. Co. v. First Title Serv. Co. of the Florida Keys, Inc., 457 So.2d 467, 472 (Fla.1984); A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla.1973); Smith Eng'g & Constr. Co. v. Cohn, 94 So.2d 826, 828 (Fla.1957), nor does this case fall under Section 552 of the Restatement (Second) of Torts, see First Fla. Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9, 12 (Fla. 1990).
The final summary judgment in favor of Judith Sams is affirmed; the judgment in favor of U.S. Life is reversed and remanded to the circuit court.
WARNER and TAYLOR, JJ., concur.
NOTES
[1] "When reviewing a ruling on summary judgment, an appellate court must examine the record and any supporting affidavits in the light most favorable to the non-moving party." Byrd v. BT Foods, Inc., 948 So.2d 921, 923 (Fla. 4th DCA 2007) (quoting City of Lauderhill v. Rhames, 864 So.2d 432, 434 n. 1 (Fla. 4th DCA 2003)).