[Cite as *Moore v. Covenant Care Ohio, Inc.*, 2014-Ohio-4113.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Alicia Moore, etc.                                        Court of Appeals No. L-13-1259

       Appellant                                    Trial Court No. CI0201202706

v.

Covenant Care Ohio, Inc., et al.

       Defendants

[Westhaven Services Co., LLC, d/b/a          **DECISION AND JUDGMENT**
Omnicare Pharmacy, etc., Kelli Renee
Jones, and Stephanie Weiss—Appellees]        Decided:  September 19, 2014

* * * * *

Jeffrey C. Zilba and Corey L. Tomlinson, for appellant.

Martin T. Galvin and David A. Valent, for appellees.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Alicia Moore, personal representative of the estate of Juanita

Williams, appeals from the October 30, 2013 judgment of the Lucas County Court of

Common Pleas granting summary judgment to appellee, Omnicare, Inc., and dismissing the wrongful death action filed by appellant. Because we find that Omnicare owed a duty to exercise reasonable care to Moore, we reverse and remand.

{¶ 2} Appellant brought a survivorship and wrongful death action for the benefit of the estate of Williams, deceased, and her next of kin. Appellant alleged a breach of pharmaceutical care owed to Williams when she was a resident at Fairview Skilled Nursing and Rehabilitation Center. The named defendants included Covenant Care Ohio, Inc., d/b/a Fairview Skilled Nursing and Rehabilitation Center; dispensing pharmacist, Kelli Renee Jones; consulting pharmacist, Stephanie Weis; and appellees, Westhaven Services Co., LLC d/b/a Omnicare Pharmacy of Northwest Ohio, and Omnicare, Inc. (collectively hereinafter referred to as "Omnicare").

{¶ 3} The following undisputed facts were submitted into evidence by the parties through the affidavit of Brian Pratt, the pharmacy manager at Omnicare; the deposition of Stephanie Weis; the deposition of Kelli Jones; the deposition of Tamara Pilaczynski, a certified pharmacy technician; and the affidavit of Robert S. Litman, R.Ph., C.Ph., GCP, a licensed pharmacist, with over 30 years of experience, in the states of Florida and Ohio, a board-certified geriatric pharmacist, and an adjunct professor of geriatric medicine at several universities.

{¶ 4} Williams became a resident at Fairview on March 28, 2011. On April 9, 2011, Kamal Nader Tadros Yoakim, M.D., became her physician and discontinued her daily dosage of 3.5 mg of an anticoagulant medication, Coumadin/Warfarin (hereinafter

2.

"Warfarin"), which had been dispensed in a combination dose of 2.5 mg and 1 mg. Dr. Yoakim increased her daily dosage to 5.0 mg for two days and then ordered a daily dosage of 4.0 mg of Warfarin to continue thereafter because of her history of deep vein thrombosis and pulmonary embolism. The doctor further ordered that her blood be drawn every Tuesday to measure her Prothrombin Time/International Normalized Ratio (hereinafter "INR") in order to determine the therapeutic effectiveness of the medication.

{¶ 5} Omnicare, Inc. became the provider of pharmaceutical medications to Williams while she was at Fairview, through its subsidiary, Westhaven Services Co., LLC d/b/a Omnicare Pharmacy of Northwest Ohio. Jones was the dispensing pharmacist for Omnicare who filled Williams' new prescription for Warfarin. Jones testified that computer-generated marks on the order form indicated that each element of the order was entered into Omnicare's computer system ("OASIS") by a technician and was verified by a pharmacist. However, the physician's orders sheets (hereinafter "POS") created by Omnicare dated May 1 and June 1 continued to show pending prescriptions for Warfarin of 2.5 mg, 1 mg, and 4 mg. Both Jones and Weis testified that while Omnicare produced the POS, it was Fairview's responsibility to correct or update the report and get the physician's signature. Jones could not explain why the May and June POS still indicated pending prescriptions for Warfarin of 2.5 mg, 1 mg, and 4 mg.

{¶ 6} Omnicare's records further indicated that 30 doses of 1 mg and 2.5 mg of Warfarin had been shipped to Fairview on March 28, 2011, and two-5 mg doses of Warfarin were shipped on April 10, 2011. The prescription for the 4 mg dose of

3.

Warfarin was received by Omnicare and entered into OASIS on April 11, 2011. However, the 4 mg doses were never shipped to Fairview.

{¶ 7} When Jones reviewed Williams' POS dated May 1, 2011, she testified she would have noticed that there were three orders for Warfarin of three different dosage levels. The computer should have caught that these orders were conflicting and caused a pop-up box to appear, which would have to be cleared before the computer could accept the order. Jones could not recall having reviewed this particular POS in May 2011, but the computer recorded that she was the verifying pharmacist. She also could not predict whether a conflict would have alerted in June 2011.

{¶ 8} Jones does not routinely verify INR results before dispensing Warfarin. Jones testified that Omnicare's policy when an order for Warfarin is received is to verify a room number or a birthday, match the doctor, review the strength and directions, and determine whether there is a duplication of therapies. Another pharmacist at Omnicare does review the INR results before dispensing Warfarin based on those results because he is a Warfarin-dosing pharmacist whose services are specifically paid for by the facilities. Jones would, however, check the INR parameters under certain circumstances such as when antibiotics were dispensed or the patient was receiving bridging therapy between anticoagulants. While Omnicare policy also provides that the pharmacist should review a patient's chart for existing Warfarin orders when a new anticoagulant order is received, Jones testified that she does not review the charts, but reviews the patient's profile in OASIS.

4.

**{¶ 9}** Williams received the 5.0 mg doses of Warfarin for two days. However, after April 10, 2011, there is conflicting evidence as to whether Williams received her daily 4.0 mg of Warfarin for the month of April. An anticoagulant administration and billing record for Williams completed by the nurses indicates that Williams was given 4.0 mg of Warfarin from April 11-30, 2011. However, during a random sampling of medical carts at Fairview on April 28, 2011, Pilaczynski, the pharmacy technician, determined that Williams' cart did not contain any Warfarin medication as prescribed. Pilaczynski notified Williams' nurse that same day. Pilaczynski testified it was not within her job description to rectify the irregularity. After April 2011, it is undisputed that Williams did not receive any Warfarin during the period of May through June, 2011.

**{¶ 10}** Pratt attested that Omnicare's policy 4.5 was in effect at the time Williams was a patient at Fairview and governed the re-ordering procedures for medication. This policy required that Fairview contact Omnicare in order to request a refill of any prescription and Fairview did not order any anticoagulation therapy refill for Williams after April 9, 2011. Jones testified that she did not know whether OASIS sent warnings if a drug was not shipped as ordered. She did not know if the pending 3.5 mg dose would have some way interfered with the delivery of the 4 mg dose. The only explanation she could give for the failure of the shipment of the 4 mg dose was Omnicare's unwritten procedure when it receives a timed, step-dosage order for one medication. Omnicare ships the first part of the order and holds the second part until the facility is ready to receive it. Therefore, after the 5 mg dose was shipped, Omnicare waited for Fairview to

5.

request shipment of the 4 mg dose.  Since Fairview did not call for the 4 mg dose to be shipped, it never was.  At the same time, the required weekly blood draws to monitor the INR ratios ceased after the April 12, 2011 lab.

{¶ 11} Stephanie Weis was the consulting pharmacist for Omnicare who conducted the drug regime reviews (hereinafter "DRR") and medication regime reviews (hereinafter "MRR") for Williams.  Weis testified that she visited Fairview on April 20, 2011, and conducted an MRR for Williams.

{¶ 12} Weis testified her review of each patient's chart takes about five-to-six minutes on average.  When she reviewed the charts, she would enter data and make notes with the help of a software system provided by Omnicare (hereinafter "OSCAR.")  The data she reviewed and/or entered into OSCAR could include the medication administration records (hereinafter "MAR"), PSOs, reported problems with the medication, lab results, diagnoses, and progress notes, all of which would suggest contraindications, dosage issues, or the need for an alternative medication.  She might, but did not need to review the drug list for every patient.  While she might have checked the MAR for specific purposes, she was not required to review the record to determine that the medication ordered by the physician was being administered.

{¶ 13} Because the April 1, 2011 POS for Williams indicated that the physician ordered Williams to receive Warfarin long term, Weis testified she would have examined the records, pursuant to Omnicare policy, to determine if an INR lab was conducted at least monthly to ensure that Williams was receiving a therapeutic dosage of Warfarin.

6.

Weis inputted into OSCAR an INR lab taken on April 9 showing an INR of 1.5. At the bottom of the report was a handwritten note indicating that Williams was to receive 5 mg of Warfarin for two days and then 4 mg of warfarin daily, with a recheck of her INR every Tuesday. This note was signed by "AM," who has not been identified. Weis could not remember if she checked to ensure that the April 12 lab had been done, but knew that she would have been concerned only that at least monthly labs were being taken. Weis did not find any irregularity in Williams' chart.

{¶ 14} At the end of April 2011, Weis prepared a quality improvement consultant pharmacist summary report to identify irregularities for the director of nursing. Weis noted in her report only the irregularity provided to her by Pilaczynski that Williams' Warfarin was not available for administration and that her nurse had been notified. The report further indicated that only 70-79 percent of medications were available for administration at the facility based on a sample survey. Weis did not follow up on the report to ensure that the director of nursing corrected the problem. If the facility had indicated in the chart that a recommendation had been dealt with, Weis would have entered that information into OSCAR.

{¶ 15} On May 10, 2011, Weis visited Fairview again to conduct an MRR for Williams. She did not enter any lab results. Normally, Weis enters the most recent lab results in OSCAR. She could not explain why the April 12 lab result was not entered into the system, but she may not have looked for labs conducted prior to April 20, 2011, her last MRR review date. She could not recall exactly what she reviewed, but had she found

7.

an INR lab result for the month of May, she would have entered it into the system. However, no such entry was made.

{¶ 16} At the bottom of the April 12th lab report was the physician's change in Williams' Warfarin medication. The note indicated that Williams was to receive 4 mg of Warfarin daily and that she had been on a prescription for two days. The note also indicated that the physician had been called, but was unavailable and that the results of the lab had been faxed to the physician. The INR lab result indicated that Williams' INR had decreased to 1.3. This note was also signed by "AM."

{¶ 17} Weis did not inquire whether Williams was receiving her prescribed 4 mg of Warfarin in May because Weis did not believe that was her responsibility. She had notified the nurse and the director of nursing of the missing medication and the POS still indicated an order for Warfarin.

{¶ 18} The POS of May 1, 2011, ordered that Williams should receive what appears to be 4 mg of Warfarin daily in addition to her 3.5 mg dose. Weis could not recall if she examined the May 1, 2011 POS or if it was in the record at the time she conducted her review. If she had been looking at the April POS, she would not have found the physician's orders to be conflicting. She ultimately reported that she did not find any irregularity in the chart.

{¶ 19} Weis prepared a May quality improvement consultant pharmacist summary report incorporating the pharmacy technician's report from April because she had not received one for May. Weis did not inquire of the technician why a report had not been

8.

prepared for May. Weis recalled that there were times the technician's report would not be completed in time for her monthly report, so she would include the prior month's report.

{¶ 20} On June 6, 2011, Weis again conducted her MRR for Williams' chart. While she investigated why there was no monthly lab for May or June, she found from the prior POS that Williams was supposed to be having weekly INR labs but Weis was unable to locate any INR lab reports. In her consultant report issued that day, she notified the director of nursing that an INR should be performed every Tuesday for Williams and that none of the lab results were in the chart.

{¶ 21} In her end of the month quality improvement consultant pharmacist summary report, Weis noted Fairview's score for medications that were available for administration had dropped to 50-59 percent. Because the percentage was based on a random sampling, Williams' medicine was not rechecked. Weis believed it was her role only to inform the facility of its shortcomings and not to investigate why the medicines were unavailable. Weis noted in OSCAR, however, that there had been no response to either of her recommendations.

{¶ 22} Weis testified she removed Williams from OSCAR on July 21, 2011, because she had been discharged to go to the hospital. After Williams was admitted to the hospital on June 14, 2011, she was diagnosed with extensive bilateral deep vein thrombosis and an acute pulmonary embolism. Williams died on July 2, 2011. The

9.

medical examiner determined that the cause of her death was acute respiratory failure secondary to pulmonary embolus and acute respiratory distress syndrome.

{¶ 23} Appellant asserted in her complaint that Omnicare's employee, Jones, violated a duty to fill and dispense the 4 mg of Warfarin ordered by Williams' physician on April 9, 2011, and send the medication to Fairview for administration to Williams. Furthermore, Omnicare failed, through its employee Weis, to perform at least a monthly DRR and MRR and report irregularities in Williams' medication administration to the physician and facilities director as required by state and federal law. Appellant specifically cited to 42 C.F.R. 483.60(c), which outlines the requirements for long-term care facilities regarding pharmacy services and requires at least monthly DRRs to be performed by a licensed pharmacist and also requires that a "pharmacist must report any irregularities to the attending physician and the director of nursing, and these reports must be acted upon."

{¶ 24} Appellant asserted that as a proximate result of Omnicare's negligence, Williams became ill and died. Appellant asserted Omnicare is liable under the doctrine of respondeat superior for the actions of its employees. Appellant asserted that Omnicare's actions constituted malice. Appellant sought compensatory and punitive damages from Jones, Weis, and Omnicare, jointly and severally.

{¶ 25} Omnicare moved for summary judgment. The trial court granted summary judgment to Omnicare on the ground that Omnicare did not owe a duty of care to

10.

Williams.  Appellant brought this appeal asserting the following single assignment of error:

> The trial court erred in holding that appellees owed no duty of care to one Juanita Williams.

{¶ 26} The appellate court reviews the grant of summary judgment under a de novo standard of review.  *Doe v. Shaffer,* 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).  Applying the requirements of Civ.R. 56(C), we uphold summary judgment when it is clear

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.  *Harless v. Willis Day Warehousing Co.*, *Inc.,* 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 27} The burden of establishing that summary judgment is an appropriate remedy always remains on the moving party.  *Vahila v. Hall*, 77 Ohio St.3d 421, 429-429, 674 N.E.2d 1164 (1997).  "A party seeking summary judgment must specifically delineate the basis for which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond."  *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526

11.

N.E.2d 798 (1988), syllabus. Even where the moving party (in this case, Omnicare) does not bear the burden of proof at trial, the movant cannot merely make conclusory assertions that there is no evidence to support the non-moving party's claim. *Vahila* at 430. The moving party bears the initial burden of coming forward with a basis for summary judgment, identifying the evidence in the record which establishes there is no genuine issue of material fact, and also identifying the essential elements of one or more of the nonmoving party's claims that are not supported by the record. *Id.* But, the moving party does not need to identify affirmative evidence which negates its opponent's claim. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996).

{¶ 28} The non-moving party has a reciprocal burden of specificity. Once the moving party has identified the issues where there is no genuine issue of material fact and the issue can be determined as a matter of law, the non-moving party must come forward with specific facts to show that there is a genuine issue for trial. Civ.R. 56(E); *Dumas v. Estate of Dumas*, 68 Ohio St.3d 405, 409, 627 N.E.2d 978 (1994); and *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991), paragraph three of the syllabus, *limited by Dresher,* at 295. The non-moving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing* and *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449, 663 N.E.2d 639 (1996).

{¶ 29} In this case, Omnicare argued that appellant could not establish that a duty was owed by Omnicare to appellant, a breach of duty, or proximate cause between the allegations of negligence and Williams' death. To support its motion, Omnicare

12.

produced its administration and billing records to evidence Williams received her Warfarin medication through April 2011, and evidence Fairview did not order any Warfarin medication for Williams after April 9, 2011. Therefore, Moore had the duty to establish her claim of negligence and, therefore, was required on summary judgment to produce evidence to support each of the prima facie elements of her claim: (1) the existence of a duty owing to the plaintiffs; (2) a breach of that duty; (3) proximate causation; and (4) damages. *Ahmad v. AK Steel Corp.*, 119 Ohio St.3d 1210, 2008-Ohio-4082, 893 N.E.2d 1287, ¶ 22, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).

{¶ 30} The trial court concluded that Omnicare owed no statutory duty of care to Williams based on its agreements with Fairview to supply the pharmaceutical needs that Fairview is obligated by law to provide for the benefit of its patients. The trial court relied upon R.C. Chapter 4729, Ohio Adm.Code 3701, and *Estate of Johnson ex rel. Johnson v. Badger Acquisition of Tampa, LLC*, 983 So.2d 1175 (Fla.App.2008). The trial court found there is nothing in R.C. 4729.16(A) that gives rise to a private cause of action by a resident for the violation of a pharmacy product and services agreement and pharmacy consulting agreement. The trial court also found that Omnicare had not assumed a duty under the agreements because Williams was not in privity to the contracts and the contracts did not give rise to a duty of care owed to Williams. Finally, the trial court found that there was no common law duty on the part of the pharmacists to oversee and guarantee administration of medication to Williams and, therefore, the pharmacists in

13.

this case owed no common law duty to Williams. The trial court also dismissed the expert's affidavit submitted by Moore for several reasons.

{¶ 31} On appeal, Moore does not argue that Omnicare breached a statutory duty or that she had a private cause of action under state and federal law for the violation of the consulting pharmacy agreement between Omnicare and Fairview. Rather, she argues that pharmacists owe a common law duty of reasonable care in rendering their services because of the foreseeability of the risk involved. We begin by addressing the admissibility of the expert's opinion.

{¶ 32} Litman attested he has had extensive experience as a dispensing pharmacist and as a consultant pharmacist. Litman explained that a

> dispensing pharmacist is generally responsible for reviewing and filling a physician issued prescription. * * * [A] consultant pharmacist is a part of a long-term care patient's health care team, and acts to monitor all aspects of drug therapy, including but not limited to assuring the accurate acquiring, receiving, dispensing, administering, and storage of all drugs and biologicals to meet the needs of each patient. A consultant pharmacist also ensures that long-term care patients are receiving and being administered his/her prescribed medications and that said patients are receiving the intended benefit(s) from his/her medications.

Litman further attested he is familiar with the standards of care required of a pharmacist and has testified as an expert in other court cases.

14.

**{¶ 33}** Litman reviewed the pertinent medical and pharmaceutical records of Williams from March 28 through June 14, 2011. To a reasonable degree of pharmaceutical probability, Litman opined that the cause of Williams' death as determined by the coroner was "consistent with the development of blood clots that would have been prevented had Ms. Williams consistently received appropriate anticoagulation therapy ordered by her physician."

**{¶ 34}** Litman further opined that Jones, the dispensing pharmacist, breached the standard of care required of her "to discontinue Ms. Williams's [sic] pre April 9, 2011 physician prescription order for the administration of 3.5 mg daily dosage of Coumadin/Warfarin" and "to dispense the 4 mg daily dosage of Coumadin\Warfarin as properly prescribed by her physician." Furthermore, he opined that her error "directly contributed to Ms. Williams's [sic] hospitalization * * * and her ultimate death."

**{¶ 35}** Litman also opined that Weis, the consulting pharmacist, breached her duty to Williams "to carefully check Ms. Williams' medical chart (at least monthly) to ensure that Ms. Williams was receiving her doctor prescribed Coumadin\Warfarin medication (MRR), and * * * to ensure Ms. Williams received therapeutic benefit(s) from her Coumadin\Warfarin therapy." As a result, Litman opined that Weis did not discover the irregularities in Williams' care and did not report to the director of nursing or physician that Williams was not receiving her medication or lab testing, which directly contributed to her hospitalization and ultimate death.

15.

**{¶ 36}** The trial court dismissed Litman's opinion as to the cause of Williams' death since he is not a physician. Upon a review of Litman's opinion, we conclude that he did not opine as to the cause of Williams' death. He attested only that the failure to take the prescribed Warfarin would have been consistent with the development of blood clots and the development of a pulmonary embolism.

**{¶ 37}** The trial court relied upon our holding in *Rybaczewski v. Kingsley*, 6th Dist. Lucas No. L-97-1048, 1998 WL 200227, *6 (Apr. 24, 1998), that a professor of biomedical engineering could not offer a "medical opinion" regarding whether the plaintiff was injured in an accident because that issue must be proven by the expert opinion of a medical doctor. The case before us is distinguishable because Litman is a medical professional with expert knowledge of the effect of pharmaceuticals on the human body. We find that Litman's opinion was limited to the medical effect of failing to take the prescribed dose of Warfarin and was not an opinion of Williams' cause of death.

**{¶ 38}** The trial court next dismissed Litman's expert opinion regarding the duties of dispensing and consulting pharmacists without citing a source for his opinion. We reject this finding as well. The source of his list of duties is indicated to be from his identified experience as both a dispensing and consulting pharmacist and the American Society of Consultant Pharmacists, which he described as responsible for setting the standards for consulting pharmacists. However, we find his opinion is irrelevant because

16.

the consulting pharmacist's duties in this case are limited to the duties set forth in the pharmacy consulting agreement as discussed below.

{¶ 39} The trial court also dismissed Litman's expert opinion because he does not relate the standard of care of his profession to the limited pharmacy services permitted under Ohio law and those services permitted under the contract between Fairview and Omnicare. We agree that the pharmacy services contracts and statutory and administrative regulations may alter the actions which satisfy the duty of reasonable care, but this fact does not invalidate the expert's opinion as to the general duties of dispensing and consulting pharmacists. The question of whether an action satisfied the standard of care is not the same question as whether Omnicare owed a duty to exercise care in the first place.

{¶ 40} Finally the trial court dismissed the affidavit on the ground that it did not address the ultimate issue in this case of why Omnicare owed a duty of care to Williams when it did not administer drugs to her, had no obligation to administer medications, and had no duty to ensure that the nursing home staff administered medication. Fairview's staff was directly responsible for the administration of the prescribed Warfarin to Williams. Furthermore, her physician was directly responsible to oversee her medical care and ensure that she was receiving a therapeutic dosage of Warfarin. This issue relates to the existence of proximate cause and not the existence of a duty to exercise care.

17.

{¶ 41} Therefore, we conclude the trial court erred in excluding Litman's affidavit from evidence.

{¶ 42} Second, we address the issue of whether Omnicare owed Williams a common law duty to exercise reasonable care.

{¶ 43} Under negligence law, the issue of whether or not a common law duty to exercise reasonable care is a question of law for the court to determine. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 24. The existence of a common-law duty depends on the foreseeability of the injury and the relationship between the parties. *Wallace* at ¶ 23 and *Simmers v. Bentley Constr. Co*., 64 Ohio St.3d 642, 645, 597 N.E.2d 504 (1992). Injury is foreseeable if a person knew or should have known that his act was likely to result in harm to someone else. *Mudrich v. Std. Oil Co*., 153 Ohio St. 31, 39, 90 N.E.2d 859 (1950). Foreseeability depends upon "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee*, 15 Ohio St.3d at 77, 472 N.E.2d 707.

{¶ 44} Generally, "[t]he common law duty of care is the degree of care that is ordinarily exercised by a reasonable and prudent person under the same or similar circumstances to avoid injuring others." *Gauci v. Ryan's Family Steak Houses, Inc.*, 6th Dist. Lucas Nos. L-03-1248, L-03-1322, 2004-Ohio-3803, ¶ 10, citing *Mussivand v. David*, 45 Ohio St.3d 314, 318-319, 544 N.E.2d 265 (1989). Professionals must exercise reasonable care and skill that a reasonable professional would have done under the

18.

circumstances. *Staph v. Sheldon*, 8th Dist. Cuyahoga No. 91619, 2009-Ohio-122, ¶ 18, quoting *Simon v. Drake Constr. Co.*, 87 Ohio App.3d 23, 26, 621 N.E.2d 837 (8th Dist.1993), and Restatement of the Law 2d, Torts, Section 299A (1965) ("Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.").

{¶ 45} Expert testimony is generally required to establish this standard of reasonable care unless the "lack of skill or care of the professional is so apparent as to be within the comprehension of the layperson and requires only common knowledge and experience to understand it." *Staph v. Sheldon*, 8th Dist. Cuyahoga No. 91619, 2009-Ohio-122, ¶ 18, quoting *Simon* at 26. *Accord Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130, 346 N.E.2d 673 (1976).

{¶ 46} The tort liability of a dispensing pharmacist is discussed in *Taugher v. Ling*, 127 Ohio St. 142, 187 N.E. 19 (1933), paragraph two of the syllabus, and *Boudot v. Schwallie,* 114 Ohio App. 495, 178 N.E.2d 599 (1st. Dist.1961). The *Taugher* court held:

> In the conduct of his business, a druggist is required to exercise that degree of care customarily used under the same or similar circumstances by ordinarily prudent and cautious persons engaged in that occupation. Such ordinary care is the highest practicable degree of prudence and caution

19.

consistent with the reasonable conduct of the business and the protection of the public. *Taugher* at paragraph two of the syllabus. The *Boudot* court held that a claim against a pharmacist is a malpractice action subject to a one-year statute of limitations. *Id*. at 496. *Compare Hocking Conservancy Dist. v. Dodson-Lindblom Assoc., Inc*., 62 Ohio St.2d 195, 196-198, 404 N.E.2d 164 (1980) (which limits malpractice actions to the professions of lawyers and physicians because they exercise independent judgment directly affecting their client/patient and necessarily will often fail to fulfill expectations yet fulfill their professional duties). Based on *Taugher*, we find pharmacists have a duty to reasonably perform their services and their duty is owed to the public in general because of the inherent danger of their services. *Edelstein v. Cook*, 108 Ohio St. 346, 140 N.E. 765 (1923), syllabus, and *Davis v. Guarnieri*, 45 Ohio St. 470, 492, 15 N.E. 350 (1887). However, the only services involved in the above-mentioned cases were the dispensing and labeling of medicines as prescribed. In the case before us the services provided by the pharmacist go beyond these basic services.

{¶ 47} Appellant asserts that this duty extends to all pharmaceutical services a pharmacist undertakes. Omnicare argues that it would be unfathomable to extend a pharmacist's duty of care to the supervision of other healthcare professionals.

{¶ 48} In the case before us, Fairview is required by Ohio law to ensure that the pharmaceutical needs of each resident are met and that a drug regimen is reviewed and documented at least once a month by a pharmacist. Ohio Adm.Code 3701-17-17(I).

20.

Furthermore, the nursing home must provide pharmacy services and "[t]he pharmacist or pharmacy service shall be responsible for maintaining supervision and control of the stocking and dispensing of drugs and biologicals in the home in accordance with state pharmacy rules." *Id.* at 3701-17-17(A)(1). "Controlled substances shall be ordered, dispensed, administered, and disposed of in accordance with state and federal laws and regulations." *Id.* at 3701-17-17(H).

{¶ 49} Omnicare contracted to fulfill these responsibilities for Fairview as permitted under Ohio law. *Id.* at 3701-17-17(A)(1). Appellee asserts that it owed no duty to Williams regarding its services because its pharmaceutical services were rendered to Fairview, not Williams.

{¶ 50} The trial court addressed Omnicare's "assumption of duty to Ms. Williams" in light the Restatement of the Law 2d, Torts, Section 323 (1965)[1], which provides that a duty of reasonable care is also owed by a professional to another if the professional undertakes to render services to that person. The trial court found that Omnicare was not liable for undertaking to perform the administrative pharmacy services for the benefit of Fairview individual residents because it contracted to performed its services only for the benefit of Fairview. We find, however, that the contract concept of privity is not

---

[1] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

21.

applicable in a tort action. Furthermore, the trial court did not consider Restatement of the Law 2d, Torts, Section 324A (1965)[2]. That section provides that a duty of reasonable care is also owed by a professional to a foreseeable third party when the professional undertakes to render services to another.

{¶ 51} Even if we consider that Omnicare undertook for consideration to render services only to Fairview, those services were necessary for the protection of Fairview residents and, therefore, Omnicare is liable under negligence law to each resident for physical harm resulting from its failure to exercise reasonable care to protect a resident if (a) the failure to exercise reasonable care increases the risk of such harm, or (b) Omnicare has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

{¶ 52} Other courts have applied this section of the Restatement to dispensing and consulting pharmacists. *Thompson v. Potter,* 268 P.3d 57, 64 (N.M.App.2011) (voluntary assumption doctrine might be applicable to a consulting pharmacist, but not in this case because consultant pharmacist did not make an error and could not have discovered the error during his monthly review), citing *Estate of Sharp v. Omnicare, Inc.*, 879 So.2d 34, 37 (Fla.App.2004) (case remanded for amendment of complaint to assert a

---

[2] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

22.

cause of action against Omnicare relating to its consulting pharmacist based on the voluntary undertaking doctrine), and *Sanderson v. Eckerd Corp.*, 780 So.2d 930, 932 (Fla.App.2001) (court noted Section 324(A) has been applied to dispensing pharmacist in other states, but not in Florida, although there was no reason it could not be in a proper case).

{¶ 53} More recently, however, in *Johnson v. Badger Acquisition of Tampa, LLC*, 983 So.2d 1175 (Fla.App.2008), which was relied upon by the trial court in the case before us, a Florida appellate court considered whether Omnicare had voluntarily assumed a duty as outlined in the Section 324A rule. While citing to Section 324A, the court found that the rule was limited to cases where there was an increase in the risk of physical harm or the undertaker was "not engaged to perform a service reasonably expected to be relied upon by a stranger to the engagement." *Id.* at 1186, quoting *Casamassina v. U.S. Life Ins. Co.*, 958 So.2d 1093, 1102 (Fla.App.2007). The *Johnson* court concluded that the consultant pharmacist did not increase the risk to the resident because ultimately the harm from the pharmaceutical regime was caused by the physician who prescribed the medication and the nursing home staff that administered the medication. *Id.* at 1186. The court also found that the residents of the nursing home do not rely upon the services of a consulting pharmacist and their services merely serve an advisory function for the physician and nursing home. *Id.* We reject this portion of the *Johnson* court's analysis because while Section 323 has such limitations of increased risk or reliance, Section 324(A) does not have these limitations. Section 324(A) also provides

23.

that a duty of care arises where the party has undertaken a duty to another knowing that a duty was owed by one person to a third person.

{¶ 54} The *Johnson* court also found that because the consultant pharmacist's duties do not exceed what is statutorily required, there was no voluntary assumption of duties. *Id*. at 1187. The court relied upon the holding in *Dent v. Dennis Pharmacy, Inc*., 924 So.2d 927, 929 (Fla.App.2006). We reject this analysis also. The pharmacist in *Dent, supra,* allegedly gave negligent advice while fulfilling his statutory duty to provide patient counseling. In the case before us, Fairview had a statutory duty to provide pharmaceutical services to its residents, not Omnicare. Omnicare had no statutory duty to provide services to the nursing home residents until it voluntarily contracted to assume those duties.

{¶ 55} We conclude that Omnicare voluntarily undertook Fairview's duty to provide pharmaceutical services to Williams and, therefore, had a duty to exercise reasonable care in providing the pharmaceutical services it agreed to provide under its contract with Fairview. Furthermore, we find that Omnicare owed a common law duty to Williams to exercise reasonable care in the dispensing and labeling of medicines.

{¶ 56} Therefore, appellant's sole assignment of error is found well-taken.

{¶ 57} Having found that the trial court did commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is reversed and remanded to

24.

**{¶ 58}** the trial court for further proceedings.  Appellees are ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                        _____

                                                         JUDGE

Thomas J. Osowik, J.

                                       _____

Stephen A. Yarbrough, P.J.                      JUDGE
CONCUR.

                                               _____

                                                         JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.